UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ANTHONY BOOZER,                      :
                                     :          <u>PRO SE</u>
                 Petitioner,         :
                                     :   04 Civ. 348 (RMB)(THK)
          -against-                  :
                                     : **REPORT AND RECOMMENDATION**
WILLIAM E. PHILLIPS, Superintendent, :
Green Haven Correctional Facility,   :
                                     :
                 Respondent.         :
------------------------------------X
**TO: HON. RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

    Petitioner, Anthony Boozer, was convicted, following a jury
trial in New York Supreme Court, Bronx County, of Murder in the
Second Degree.  He was sentenced to an indeterminate term of
incarceration of twenty-five years to life, and is currently
serving his sentence at Green Haven Correctional Facility.

    Petitioner seeks habeas corpus relief pursuant to 28 U.S.C.
§ 2254, claiming that the New York State trial court (1)
improperly instructed the jury on the defense of justification;
(2) abused its discretion in denying Petitioner's motion to
vacate his conviction because the grand jury proceedings were
defective; (3) improperly delegated its role as supervisor of
jury selection; and (4) erred in permitting a medical examiner to
testify as an expert on blood splatter.

    Respondent argues that Petitioner's jury instruction and
grand jury claims are unexhausted and procedurally barred.


**COPIES MAILED**
**TO COUNSEL OF RECORD ON** __8/17/06__

Respondent further argues that the improper delegation claim is forfeited because it was rejected on independent and adequate state procedural grounds. Finally, Respondent contends that a state court's qualification of an expert witness is not a proper subject for federal habeas review.

This proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern District of New York. For the reasons that follow, the Court concludes that Petitioner is not entitled to habeas relief and recommends that this action be dismissed with prejudice.

## BACKGROUND

On the morning of April 23, 1999, Petitioner killed his roommate, Elcee Bright. A few hours later, Petitioner admitted the homicide to Sharmen Norris, the mother of his two children. That afternoon, Petitioner reported Bright's death to the authorities, and feigned ignorance as to the murderer. Five days later, the detective assigned to the case, Melvin Carter, questioned Norris about Petitioner. After initial reluctance, Norris told Carter of Petitioner's involvement. Carter then confronted Petitioner and challenged the truthfulness of his original story. Petitioner recanted and admitted killing Bright, but claimed it was in self-defense.

I.   The Evidence

The jury was presented with at least four sources of evidence to evaluate Petitioner's justification defense: (1) the police officers' descriptions of, and forensic evidence taken from, the crime scene (see Trial Transcript ("Trial Tr.") at 90-202, 268-321); (2) Norris's recounting of her conversations that day with Petitioner (see id. at 203-56); (3) Petitioner's own version of the events (see id. at 458-563); and (4) Dr. Susan Ely's expert medical and forensic evaluation of the crime scene and the deceased (see id. at 321-453).

A.   The Crime Scene

At approximately 4:00 p.m. on April 23, 1999, Officer Bart Pipcinski and his partner responded to a report of an "unconscious male" in a Bronx apartment. (See id. at 92-94.) Though they were the first police officers to arrive, EMS and New York City Fire Department personnel were already there and had secured the crime scene. (See id. at 94-95.)  Pipcinski entered and observed "what appeared to be a male on the floor on cushions" in the living room. (Id. at 95.)  The man's "face was covered with blood.  [His race] was hard to make out." (Id. at 96.)  "There was blood on the walls[,] . . . on the cushions and . . . . [a] pool of blood next to the cushions." (Id. at 98.)  A bloody, nine-inch steak knife lay near the deceased. (See id.)

There were no large concentrations of blood anywhere else in the apartment. (See id.) There was no sign of forced entry, no furniture was overturned, and nothing was broken, but there were "two holes in the wall next to the victim." (Id. at 99-100.) Photographs entered into evidence confirmed all of these details. (See id. at 102-112.)

Detective Joseph Bello of the Crime Scene Unit was called to the scene to take forensic evidence. (See id. at 141, 146.) Bello was unable to recover any fingerprints from the knife. (See id. at 153-54.) Bello noted that most of the blood on the wall was near the body, from "the top of the sofa down," but "[t]here was also some blood on the ceiling and away from where the body was found on the wall" on the other side of the room. (Id. at 161, 164.) However, Bello observed that there was no blood on the deceased's feet, indicating he had not walked through any of the blood. (See id. at 179.) Bello also noted that there was some type of blanket or sheet on top of the cushions and underneath the body. (See id. at 202.) Finally, Bello confirmed that there were no signs of a forced entry or broken items, and no blood evidence in other rooms of the apartment. (See id. at 172-78.)

Petitioner was sitting on steps outside the apartment when the first officers arrived. (See id. at 124.) Petitioner

4

identified the deceased as Elcee Bright, his roommate of a few months. (See id. at 122-25.) Petitioner related that he slept in the bedroom and Bright slept in the living room. (See id. at 125-26.) Pipcinski testified that Petitioner "seemed upset, [and] nervous." (Id.) According to Pipcinski, Petitioner "said he didn't know what happened. . . . [H]e left early in the morning, he went out all day, he came home, he walked into the apartment, discovered Mr. Bright, [and] went running out of the apartment, . . . banging on doors and asking people for help, to call 911." (Id. at 126.) Pipcinski did not observe any scratches, bruises, or bleeding on Petitioner's face or hands, and did not consider him a suspect. (See id. at 130, 133.)

Detective Melvin Carter, assigned to investigate the homicide, also spoke to Petitioner that day, and "didn't see him as a suspect" at the time, but "didn't discount him either." (Id. at 271, 281.) In response to Carter's questions about possible suspects or motives for Bright's death, Petitioner suggested that Bright had had a falling out with a man named Danny one week earlier. (See id. at 275.) Petitioner also stated that two men he didn't know were there the night before, and that "Bright had owed people in the neighborhood a lot of money." (Id. at 276-77.)

B.    Norris's Testimony

Over the next several days, Detective Carter tried to find Danny and follow other leads, but "got nowhere." (Id. at 285.) On April 28, 1999, he met with Sharmen Norris to verify the alibi Petitioner had given another detective. (See id. at 289.)    Norris did not initially provide any information regarding the case, so after roughly half an hour, Carter left her with his business card and "told her that if she had any other information, . . . she would have to really come clean and tell [him] the truth." (Id. at 292.)    Later that day, Norris called Carter; she sounded upset and asked him to return to her house. (See id.)    Carter went and brought Norris back to the precinct, where she gave a statement, all the details of which she would later recount at trial. (See id. at 225.)

Norris testified that she was called by Petitioner, the father of her two youngest children, at around 8:30 a.m. on April 23, 1999. (See id. at 205-07.)    Petitioner sounded angry and announced, "I'm going to kill the mother fucker.    I'm going to kill the mother fucker with this pipe in my hand." (Id. at 209.) Norris asked who he was talking about, and Petitioner indicated Bright, whom Petitioner suspected of stealing approximately $150 from his wallet. (See id. at 209-10.)    Norris asked him where Bright was; Petitioner responded that he was sleeping on the

living room floor. (See id. at 211.) Norris told Petitioner not to confront Bright and encouraged him to come see her and the children at the dentist's office. (See id. at 209-10.) Petitioner agreed to meet her and they hung up. (See id.)

Petitioner met Norris at the dentist's office more than two hours later, a little past 11:00 a.m. (See id. at 213.) Norris did not ask him about Bright. (See id. at 246.) After returning to Norris's home, Petitioner retrieved some boots he had left there. (See id. at 216.) As Petitioner changed out of his sneakers, he announced to Norris, "I did it. I killed Elcee." (Id. at 217.) Petitioner said he "had to do it," but he did not say anything about Bright having woken up, having possessed a knife, or having threatened to stab him first. (See id. at 230, 255.) After leaving Norris's home, Petitioner disposed of his sneakers, one of them down a sewer. (See id. at 119-20.) He said he had thrown the pipe in an empty lot. (See id. at 220.) Later, after they had separated, Petitioner called Norris and told her that he had reported Bright's death, and "acted as if he didn't know what happened." (Id. at 221.)

Norris further testified that she was initially unhelpful to the detectives because she was scared. (See id. at 222-23.) Petitioner had told her not to say anything about the incident. (See id.) However, Norris spoke to a friend about her

predicament, and the friend advised her to tell the truth to avoid getting in trouble or having her children taken away. (See id.) Norris took that advice and told Detective Carter her story. (See id. at 225.)

C.  Petitioner's Testimony

After taking Norris's statement, Carter went to Petitioner's home and asked him to come back to the police precinct to make an official statement. (See id. at 293-94.) Petitioner complied, and wrote out a statement reiterating that he had been out all day and did not know what happened to Bright. (See id. at 298-300.) Carter then related to Petitioner that he knew Petitioner had "left something out," telling Petitioner, "[Y]ou know what happened, I know what happened. Only you can tell me." (Id. at 301-02.) Petitioner became upset and twice yelled out to Norris, whom he knew to be in another room in the precinct, "Sharmen, go home." (Id. at 301.) Finally, Petitioner agreed to dictate a statement, which Carter wrote down after giving Petitioner his Miranda warnings. (See id. at 303-04.) That statement was read by Carter at trial (see id. at 308-10), and Petitioner elaborated on its contents in his own testimony (see id. at 458-563).

Petitioner testified that he had found money missing from his wallet when he woke up on April 23, 1999, and he suspected Bright had taken it because they had had disagreements in the

past over Bright taking his money and food. (See id. at 468-72.)
Petitioner admitted that Bright was asleep at the time, and that,
making efforts to avoid waking Bright, Petitioner took the phone
to his bedroom and called Norris. (See id. at 474.) Petitioner
acknowledged telling Norris, "I'm going to kill this mother
fucker," but Petitioner denied that he meant his words, calling
them "slang terminology." (Id. at 471, 477.) Petitioner also
denied having a pipe in his hand at the time, testifying that he
told Norris he had "a pipe in [his] room." (Id. at 475.)

Petitioner testified that when he got off the phone, Bright
had gotten up and was walking toward the closet to put away his
blanket. (See id. at 478.) Petitioner began angrily slamming
doors and pots around until Bright asked him if something was
wrong. (See id. at 479-80.) Petitioner accused Bright of having
stolen his money. (See id. at 480.) Bright then jumped up,
"reached over to the kitchen drawer and grabbed a steak knife."
(Id.) Petitioner ran toward the front door, but "couldn't get
the chain off the door." (Id. at 481.) So Petitioner grabbed a
pipe that was laying near the door and he ran back to the living
room. (See id. at 481.) Bright then reportedly lunged at
Petitioner with the knife, at which point Petitioner struck him
in the head with the pipe. (See id. at 481-82.) When Bright came
charging again, Petitioner hit him again. (See id. at 482.)

9

Petitioner then grabbed Bright's knife-holding hand, and the two struggled across the room as Petitioner continued to hit Bright with the pipe. (See id.) Petitioner could not recall how many times he hit Bright, nor how many times Bright had lunged or swiped at him with the knife. (See id. at 482-83.) "At one point, the knife . . . went in [Bright's] chest," his head fell back, and he made a sound "[l]ike he couldn't catch his breath." (Id. at 483-84.) It was then that Petitioner knew Bright had died. (See id. at 484.)

Petitioner also described his attempts to clean up after the incident, and to dispose of some of the evidence. (See id. at 487.) Petitioner mopped some of the blood off the floor and also washed it off his body. (See id.) He then put his bloody shirt and the pipe into a garbage bag, which he threw into a dumpster across the street. (See id.) Petitioner also admitted changing out of and disposing of his bloodied sneakers after meeting up with Norris, and acknowledged telling her that he had killed Bright. (See id. at 489.) Petitioner explained his attempt to destroy evidence and subsequent lies to the authorities: "I was scared. I had a whole criminal record. Who [was] going to believe me?" (Id. at 492.)

D.  The Expert Testimony

The State called as a witness Dr. Susan Ely, a senior medical examiner and forensic pathologist in the Office of the Chief Medical Examiner of the City of New York. (See id. at 322.) The defense challenged, both in and out of the presence of the jury, Dr. Ely's qualifications to speak about various issues, particularly blood spatter analysis. (See id. at 341-45, 359-62, 382-83, 387-416, 419-23.)

Based on those objections, the trial judge held an impromptu hearing to further determine Dr. Ely's qualifications, beyond those already adduced during her direct examination. (See id. at 400-17.)  Dr. Ely's education and training included: a Medical Degree and Masters in Public Health from Tulane University; residency training in pathology; year-long forensic training, including crime scene visits and blood pattern analysis; and board certification in the fields of surgical pathology, clinical pathology, and forensic pathology. (See id. at 325-27, 400.)  Dr. Ely testified that she had performed hundreds of autopsies on victims of both blunt force and sharp force trauma. (See id. at 329-30.)  In the course of her work, she also continued to go to crime scenes "on an as needed basis." (Id. at 401.)  Dr. Ely had previously testified as an expert in at least twenty cases, and had never been denied expert status. (See id. at 329.)  She could

not recall whether she had testified specifically about blood spatter in those previous cases, but said that she gave lectures on crime scene blood patterns "on average, once every one to two months." (Id. at 404-05.) After hearing Dr. Ely's qualifications, the judge overruled the defense's objections to her expert status. (See id. at 408.) The judge did, however, prohibit her from giving opinions on matters she could not conclude with "reasonable medical certainty." (See id. at 415-16.)

Dr. Ely performed the autopsy on Bright's body on April 24, 1999, and testified about her findings. (See id. at 332.) She determined that there were two causes of death — a "stab wound to the chest, with perforation of the heart and lung, and multiple blunt impacts of the head causing skull fractures and brain injury impacts." (Id. at 333.) It was "impossible to know which one was more lethal than the other." (Id. at 334.) The stab wound was "clean," "meaning without surrounding scratches, abrasions or any other unusual mark that indicates movement or struggle." (Id. at 340.) The blunt impacts to the head and face caused ten lacerations, "shattered" the skull, and "extensively bruised" the brain. (Id. at 365.) Bright could not have "maintain[ed] any level of consciousness after receiving the sum total of those blows to the head." (Id. at 434.) Indeed, "it

12

[was] likely that less than ten blows rendered him incapacitated." (Id. at 440.) Bright also had non-lethal injuries — a cut on the back of his right hand, a cut on his right ear, and a stab wound through his right eye that penetrated the skull. (See id. at 375-78.) All of the sharp force wounds were consistent with the knife recovered from the scene. (See id. at 384.) All of the blunt force wounds could have been caused by a metal pipe. (See id. at 432.)

Dr. Ely also testified about the blood spatter at the crime scene and the conclusions that she had drawn from it. (See id. at 427-31.) "The overwhelming blood pattern at the scene indicate[d] that the majority of the blows to the head that caused lethal bleeding . . . [were] sustained when [Bright] was on the cushions in a reclined or semi-reclined position." (Id. at 430.) Moreover, there was "no downward dripping pattern of blood on the clothing and pants of Mr. Bright. His feet [had] no blood on the top or the bottom. Those two factors [made] it highly unlikely that he was in an upright position during an altercation when he received significant injuries to his head." (Id. at 429.) Dr. Ely did not recognize "any significant, distinctive pattern" in the small amount of blood found on the wall across the room, noting it could have come "from any number of things." (Id. at 430.) She admitted it was possible that Bright had received one

or two blows while in that location, but thought it unlikely because one would not expect "minimal bleeding from any scalp wound laceration." (Id. at 442.)

II. Jury Instructions and Verdict

In charging the jury, the trial judge, Justice William C. Donnino, addressed, inter alia, the issue of Dr. Ely's testimony, giving the jury a detailed expert witness instruction. (See id. at 646-47.) Justice Donnino also gave an extended instruction on self-defense and allocation of the burden of proof. (See id. at 647-53.)

After one day of deliberations, including requests to review much of the evidence and to distinguish the two counts charged, the jury reached a unanimous verdict. (See id. at 669-709.) They found Petitioner guilty of Murder in the Second Degree, and not guilty of Manslaughter in the First Degree. (See id. at 709-10.)

III. Post-Conviction Proceedings

A. Collateral Attack

In pro se papers dated October 16, 2001, Petitioner moved to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10, on the ground that his due process rights were infringed by the People's failure to introduce to the grand jury a videotaped statement he had made to the police. (See Petitioner's Motion to Vacate ("Petr.'s Mot. to Vacate"), attached as Exhibit ("Ex.") 1

to Respondent's Memorandum of Law in Opposition to the Petition ("Respt.'s Mem.").) Petitioner contended that the videotaped statement elaborated upon his written statement admitting the homicide, and provided additional details to support his justification defense. (See id. at 2.) Petitioner further alleged that he had wanted to himself speak before the grand jury, but his counsel had advised him against it, assuring Petitioner that the District Attorney would show the grand jury his videotape. (See id. at 6.) After learning that the tape was not shown, Petitioner charged that he "was coerced to waive his right to appear . . . [and] testify in his own behalf." (Id.) The People opposed Petitioner's motion, arguing that any such claim should have been argued on direct appeal, and alternatively, that the claim was meritless because "the prosecution is not required to present [to the grand jury] all evidence it possesses that is favorable to the accused." (Affirmation in Opposition, dated Feb. 11, 2002, attached as Ex. 2 to Respt.'s Mem., ¶¶ 9-10.)

Justice Donnino denied Petitioner's motion on March 7, 2002, finding that the grand jury claim was not cognizable under N.Y. Crim. Proc. Law § 440.10 because Petitioner had been convicted after a trial by jury. (See Order, dated Mar. 7, 2002, attached as Ex. 3 to Respt.'s Mem., at 1.) The court found, on the

merits, that under New York law, the State was not required to introduce Petitioner's videotaped statement because it was not a redacted part of the introduced written statement, nor was its exclusion otherwise unfair. (See id.)  Petitioner had failed to provide "details about how the introduction of this additional statement before the Grand Jury could have eliminated an unfounded prosecution." (Id. at 2.)  The Appellate Division, First Department, granted Petitioner leave to appeal that decision. (See Certificate Granting Leave, dated June 4, 2002, attached as Ex. 5 to Respt.'s Mem.)

B.    Direct Appeal

Petitioner's counsel filed two briefs with the Appellate Division, presenting a total of four claims. (See Petitioner's Appellate Brief, dated Mar. 2002 ("Petr.'s App. Br."), attached as Ex. 6 to Respt.'s Mem.; Petitioner's Supplemental Appellate Brief, dated July 2002 ("Petr.'s Supp. Br."), attached as Ex. 7 to Respt.'s Mem.)  The main brief argued that (1) the trial court erred in qualifying Dr. Ely as an expert on blood spatter (see Petr.'s App. Br. at 21); (2) "the trial court improperly ceded its role as supervisor of jury selection" by asking jurors whether "they were 'willing to sit on this case'"; and (3) the State had "deprived [Petitioner] of his right to a meaningful appeal by losing [an allegedly prejudicial] trial exhibit." (Id.

16

at 21, 27, 31.) The claim for the loss of the trial exhibit "was recanted by appellate counsel" after the State produced the photograph. (See Petition ("Pet."), at I.) Petitioner's Supplemental Brief argued that the lower court had erred in "summarily denying" Petitioner's Section 440 motion because the motion had "adequately presented" an ineffective assistance of counsel claim which the court had failed to address. (See Petr.'s Supp. Br. at 4.)[1]

Petitioner also moved to file a pro se supplemental brief with the Appellate Division, raising two additional claims. (See Notice of Motion for Permission to File Pro Se Supplemental Brief on Appeal, dated Mar. 26, 2002 ("Petr.'s Pro Se App. Mot."), attached as Ex. 8 to Respt.'s Mem.) Petitioner claimed that (1) the trial court's jury instruction on justification "was awkward and confused the standard for determining the reasonableness of the defendant's belief that it was necessary to use deadly physical force;" and (2) his "grand jury proceedings were defective" because the State had omitted exculpatory evidence, thus violating his federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments. (Id. ¶ 6.) The Appellate Division denied the motion, "without prejudice to renewal upon submission of a notarized affidavit setting forth, in detail, the

---

[1] Petitioner has not raised this claim in this proceeding.

specific issues sought to be raised in the proposed pro se supplemental brief." (Order, dated May 14, 2002 ("Supp. Brief Order"), attached as Ex. 9 to Respt.'s Mem.) Three months later, Petitioner renewed his motion by letter, enclosing copies of correspondence with his attorney that he said "would verify [his] objection to prosecutors [sic] failure to present a 'Recorded Oral Statement' . . . to a Grand Jury Panel." (Petitioner's Renewal Letter, dated Aug. 6, 2002 ("Petr.'s Renewal Letter"), attached as Ex. 10 to Respt.'s Mem.)

The Appellate Division denied Petitioner's renewed motion to file his pro se supplemental brief the same day it issued its opinion. (See M-4843 People v. Boozer, dated Oct. 22, 2002 ("Second App. Denial"), attached as Ex. 12 to Respt.'s Mem., at 3.) The opinion unanimously affirmed the judgment of the lower court on all three of Petitioner's remaining claims. See People v. Boozer, 298 A.D.2d 261, 261, 748 N.Y.S.2d 379, 380 (1st Dep't 2002). It found that the trial court had "properly exercised its discretion in qualifying [Dr. Ely] as an expert on blood spatter," and that her qualification "was fully supported by her testimony regarding her classroom and on-the-job training as well as her experience in that subject." Id. The Appellate Division denied Petitioner's jury selection claim on procedural grounds, finding that it was unpreserved below. See id. Moreover, the

court noted, "Were we to review this claim, we would find that the court's procedure was an effective screening device and a proper exercise of discretion." Id.  Finally, the Appellate Division held that Petitioner "was not entitled to a hearing on his CPL 440.10 motion since his allegation that his attorney provided improper and incorrect advice, which discouraged defendant from choosing to testify before the grand jury, would not, if true, establish ineffective assistance of counsel." Id. at 261, 748 N.Y.S.2d at 381.  The Appellate Division found Petitioner's constitutional argument, that he was denied his rights to due process and to testify on his own behalf as a result of the alleged improper advice, to be without merit. See id. at  261, 748 N.Y.S.2d at 381.

Petitioner's counsel sought leave to appeal by letter to the New York Court of Appeals. (See Petitioner's Leave Application, dated Nov. 15, 2002, attached as Ex. 13 to Respt.'s Mem.)  In addition to specifically discussing both the jury selection and expert qualification claims, counsel requested that the court review "all the issues outlined in the original and supplemental briefs he submitted to the Appellate Division." (Id. at 5.)  On December 31, 2002, the Court of Appeals denied Petitioner's application. See People v. Boozer, 99 N.Y.2d 555, 754 N.Y.S.2d 207 (2002).

C.    Habeas Review

Petitioner filed the instant habeas Petition on November 21, 2003, attaching as appendices lists of the claims presented at each level of appeal. (See Pet. at I-iv.)  On a page entitled, "Grounds Presented on Writ Habeas Corpus," Petitioner clearly lists the four claims he is raising in his Petition. (See id. at iv.)  Petitioner claims that the New York State trial court: (1) improperly instructed the jury on the defense of justification; (2) abused its discretion in denying Petitioner's motion to vacate his conviction because his grand jury proceedings were defective; (3) improperly delegated its role as supervisor of jury selection; and (4) erred in permitting Dr. Ely to testify as an expert on blood splatter analysis. (See id.)

In May 2004, this Court granted Petitioner's request to stay his petition while he sought a writ of error coram nobis in state court alleging ineffective assistance of appellate counsel. (See Memorandum Endorsed Order, dated May 10, 2004.)  Petitioner was instructed to "amend the Petition within thirty days of exhausting his appellate counsel claim," at the risk of forfeiting such claim for habeas review. (Id.)  Petitioner submitted his motion to the Appellate Division one month later. (See Notice of Motion for a Writ of Error Coram Nobis, dated June 15, 2004.)  The Appellate Division denied his application on

October 21, 2004. See People v. Boozer, 11 A.D.3d 1051, 783 N.Y.S.2d 896 (1st Dep't 2004). Petitioner promptly moved the Appellate Division for reconsideration. (See Notice of Motion for Reconsideration, dated Nov. 23, 2004.) The First Department again denied his application. See People v. Boozer, 2005 N.Y. App. Div. Lexis 5517, at *1 (1st Dep't May 17, 2005). Petitioner informed this Court, by letter dated May 30, 2005, of his request to appeal that ruling to the New York Court of Appeals, and this Court reiterated that "[any] amendment to the Petition must be filed within 30 days of the decision of the Court of Appeals." (Memo Endorsed Order, dated June 3, 2005.) On October 31, 2005, the Court of Appeals denied leave to appeal. See People v. Boozer, 5 N.Y.3d 850, 806 N.Y.S.2d 170 (2005). Four months later, Petitioner having failed to amend the Petition, this Court denied a further stay and prohibited Petitioner from seeking any additional leave to amend. (See Order, dated Mar. 7, 2006, at 9.) Accordingly, the Petition is deemed complete, and the Court has addressed only the original four claims raised in the Petition.

## DISCUSSION

### I. AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if the state court adjudication "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Leslie v. Artuz, 230 F.3d 25, 32 (2d Cir. 2000); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. See Williams, 529 U.S. at 412, 120 S. Ct. at 1523; see also Leslie, 230 F.3d at 32.

"The 'unreasonable application' standard is independent of the 'contrary to' standard . . . [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law. Henry v.

Poole, 409 F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at 411, 120 S. Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. See Williams, 529 U.S. at 413, 120 S. Ct. at 1523. The Second Circuit has noted that "Williams also made clear that a federal habeas court may permissibly conclude that federal law has been unreasonably applied by the state court even though not all reasonable jurists would agree that the state court's application was unreasonable." Henry, 409 F.3d at 68. Thus, a court should inquire as to whether the state court's application was "objectively unreasonable," falling "somewhere between merely erroneous and unreasonable to all jurists." Id. (internal quotations omitted).

Further, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003). A state

court's decision "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

## II.  Exhaustion and Procedural Bar

Before a federal court may consider a state prisoner's petition for a writ of habeas corpus, all state remedies must be exhausted. See 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275-76, 92 S. Ct. 509, 512-13 (1971); Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997). To satisfy the exhaustion requirement of 28 U.S.C. § 2254, "it is not sufficient merely that the [petitioner] has been through the state courts." Picard, 404 U.S. at 275-76, 92 S. Ct. at 512-13. Rather, the claims must be "fairly presented" to the state courts so that the state has an opportunity to correct any alleged constitutional violations. See Castille v. Peoples, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060 (1989); Picard, 404 U.S. at 276, 92 S. Ct. at 513.

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye v. Attorney Gen, 696 F.2d 186, 194 (2d Cir. 1982) (en banc).

Moreover, to satisfy this requirement, a petitioner must fairly present his federal claims to the highest state court from which a decision can be had. See Daye, 696 F.2d at 191; accord Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000); Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990).

A petitioner must return to state court if he has not exhausted his state remedies. See Engle v. Isaac, 456 U.S. 107, 125-126 n.28, 102 S. Ct. 1558, 1570 (1982); Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991); Robertson v. Artuz, No. 97 Civ. 2561 (DC), 2000 WL 10265, at *3 (S.D.N.Y. Jan. 4, 2000). However, for exhaustion purposes, "'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" Grey, 933 F.2d at 120 (quoting Harris v. Reed, 489 U.S. 255, 263 n.9, 109 S. Ct. 1038, 1043 n.9 (1989)). If a petitioner has no available state forum in which to pursue a remedy because of a state procedural bar, his claim may be deemed exhausted, yet procedurally barred. See Teague v. Lane, 489 U.S. 288, 297-299, 109 S. Ct. 1060, 1068-1069 (1989); Grey, 933 F.2d at 120.

Most commonly, a state appellate court directly determines that a claim is procedurally barred under state law.  In such

25

cases, the independent and adequate state ground doctrine usually bars federal habeas review, because the last state court rendering a judgment expressly rested its denial of a claim on the petitioner's failure to meet a state procedural requirement. See Coleman v. Thompson, 501 U.S. 722, 729-730, 111 S. Ct. 2546, 2554 (1991); Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995); see also Brown v. Miller, 451 F.3d 54, 56 (2d Cir. 2006) ("Federal habeas courts do not generally entertain arguments that were procedurally defaulted in the state court if the finding of default constitutes an 'independent and adequate state ground' for the state court's decision."). However, a procedural bar will be deemed adequate, "only if it is based on a rule that is firmly established and regularly followed by the state in question." See Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003).

The only way a petitioner can obtain review of a procedurally barred claim is if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Id. at 750, 111 S. Ct. at 2565; accord Dretke v. Haley, 541 U.S. 386, 393, 124 S. Ct. 1847, 1852 (2004). A petitioner must make this showing regardless of whether the procedural bar was determined

on direct review by a state appellate court or whether an unexhausted claim was deemed exhausted, but procedurally barred, by a federal habeas court. See, e.g., Grey, 933 F.2d at 121 (requiring petitioner to show cause and prejudice where the federal court deemed petitioner's unexhausted sentencing and prosecutorial misconduct claims exhausted, but procedurally barred); Rolling v. Fischer, 433 F. Supp. 2d 336, 345 (S.D.N.Y. 2006) (applying cause and prejudice exception where petitioner's counsel failed to object to an identification at trial, and the state appellate court held the claim unpreserved and procedurally barred). "[T]he cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." McClesky v. Zant, 499 U.S. 467, 493, 111 S. Ct. 1454, 1470 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986)); accord Bloomer v. United States, 162 F.3d 187, 191 (2d Cir. 1998). Once a petitioner shows cause, the petitioner must also establish prejudice by demonstrating that there is a "reasonable probability" that, but for the constitutional violation that is the subject of the defaulted claim, the outcome of the relevant proceeding would have been different. See Strickler v. Greene, 527 U.S. 263, 289, 119 S. Ct. 1936, 1952 (1999); McClesky, 499 U.S. at 494, 111 S. Ct. at 1471.

Alternatively, if a petitioner cannot show cause and resulting prejudice, the petitioner may still overcome a procedural bar by demonstrating a fundamental miscarriage of justice. This is an "extraordinary case" in which "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 492, 106 S. Ct. 2639, 2647 (1986); Lebron v. Mann, 40 F.3d 561, 564 (2d Cir. 1994). Under this standard, a petitioner has the burden of demonstrating that he is "actually innocent" by showing that there is "a fair probability that . . . the trier of the facts would have entertained a reasonable doubt of his guilt." Lebron, 40 F.3d at 564 (quoting Kuhlmann v. Wilson, 477 U.S. 436, 455 n.17, 106 S. Ct. 2616, 2627 n.17 (1986)).

III. Jury Instruction Claim

Petitioner first contends that the trial court's instruction on justification "employed an improper quotation of [N.Y.] Penal Law § 35.15, which was awkward and confused the standard for the jurors' determination of the reasonableness of the petitioner's belief that it was necessary to use deadly physical force." (Pet. at iv.)

Petitioner's claim is unexhausted because it was not fairly presented in state court. The jury instruction claim was not raised in either the main brief or the supplemental brief filed

28

by Petitioner's counsel with the Appellate Division. (See Petr.'s App. Br. at I-ii; Petr.'s Supp. Br. at I.) Rather, Petitioner attempted to raise his jury instruction claim in his motion for permission to file a pro se supplemental brief (see Petr.'s Pro Se App. Mot. ¶ 6(A)), which the Appellate Division denied because Petitioner failed to "set[] forth, in detail, the specific issues sought to be raised," (Supp. Brief Order at 1). Nor did Petitioner indicate to the Appellate Division the federal constitutional nature of his claim, using any of the methods cited by Daye. (See Petr.'s Pro Se App. Mot. ¶ 6(A).) Instead, Petitioner merely claimed that the jury instruction did not comport with state law. (See id.) Neither of these deficiencies was cured by Petitioner's Renewal Letter to the Appellate Division, prompting its second denial of leave to file a supplemental brief. (See Second App. Denial at 3.) Because Petitioner did not properly use all available mechanisms to secure appellate review of this claim, it was not fairly presented, and is therefore unexhausted. Cf. Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981) ("where the petitioner did not utilize all the appellate procedures of the convicting state to present his claim, he has failed to exhaust his state remedies"), overruled on other grounds, Daye v. Attorney Gen., 696 F.2d at 195.

Moreover, Petitioner's jury instruction claim is procedurally defaulted because the issue cannot now be heard by the New York State courts. Since Petitioner's claim turns on facts in the record, it could only have been brought on direct appeal. See N.Y. Crim. Proc. Law § 440.10(2)(c); Dunham v. Travis, 313 F.3d 724, 729 (2d Cir. 2002) ("In New York, a criminal defendant may not raise in a § 440 motion a claim that could have been raised on direct appeal."). Petitioner is entitled to only one direct appeal, see Aparicio v. Artuz, 269 F.3d 78, 91 (2d Cir. 2001) (citing N.Y. Crim. Proc. Law § 450.10(1)). Having had that one direct appeal, Petitioner therefore forfeits the claim unless he can demonstrate cause and prejudice, or a fundamental miscarriage of justice.

Petitioner asserts none of these arguments. He alleges no external cause for his failure to raise the claim in his initial appellate briefs, nor for his failure to elaborate on the grounds for the claim, as instructed by the Appellate Division. Petitioner also does not demonstrate prejudice, nor can he, because his claim would not be meritorious.

A state court's jury instruction "is normally a matter of state law and is not reviewable on federal habeas corpus." United States v. Montanye, 505 F.2d 1355, 1359 (2d Cir. 1974). For a misstatement of law in jury instructions to merit habeas

relief, "the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (citation omitted). "Not every ambiguity, inconsistency or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437, 124 S. Ct. 1830, 1832 (2004) (per curiam) (citing Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991)). The question is not whether the court gave a faulty or erroneous instruction, but whether the challenged instruction "so infected the entire trial that the resulting conviction violates due process." Davis, 270 F.3d at 123 (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 400 (1973)); accord Middleton, 541 U.S. at 437, 124 S. Ct. at 1832. A federal court must assess a challenged instruction "as the jury understood it, as part of the whole instruction, and indeed, as part of all the proceedings that were observed by the jury." Smalls v. Batista, 191 F.3d 272, 277 (2d Cir. 1999) (quoting Chalmers v. Mitchell, 73 F.3d 1262, 1267 (2d Cir. 1996)).

In explaining the law on self-defense, the trial court went into significant detail as to the definition of reasonable belief:

A defendant reasonably believes deadly physical force to be necessary to defend himself from what the

Defendant reasonably believes to be the use or imminent use of deadly physical force by Elcee Bright when, one, the Defendant in fact believed that the deadly physical force used was necessary to defend himself from what the Defendant in fact believed to be the use or imminent use of such force by Elcee Bright, and two, a reasonable person in the Defendant's position, knowing what the Defendant knew and in the circumstances of which the defendant was, could have had such belief.

Thus under our law of justification it is not sufficient for a reasonable belief that the Defendant honestly believed in his own mind that he was faced with the imminent use of deadly physical force, and honestly believes no matter how genuine or sincere, may yet be unreasonable to be justified in the use of deadly physical force.

The Defendant must honestly believe that the deadly physical force used was necessary to defend himself from what he honestly believed to be the use or imminent use of such force by Elcee Bright and a reasonable person in the Defendant's position, knowing what the Defendant knew and in the circumstances in which the Defendant was, would have had such belief.

In examining whether the Defendant does reasonably believe that deadly physical force used was necessary to defend himself from what he reasonably believed to be the use of, imminent use of such force by Elcee Bright, it does not matter the Defendant was or may have been mistaken in his belief as long as that belief was honestly held by the Defendant and that belief was reasonable.

(See Trial Tr. at 649-51) (commas added). This explanation, and the rest of the court's charge, closely follow N.Y. Penal Law § 35.15 and New York's pattern jury instruction on the justification defense. See CJI2d [NY] Justification: Use of Deadly Force in Defense of a Person. This may be the reason that Petitioner's counsel did not object to the charge after it was

32

given. (See Trial Tr. at 668-69.)[2]  Because the challenged

instruction did not differ substantially from, and indeed

followed, the pattern instruction and law on justification, the

instruction cannot be said to have infected the entire trial so

as to make Petitioner's conviction violate due process. Cf.

Diguglielmo v. Smith, 366 F.3d 130, 137 (2d Cir. 2004) (affirming

denial of habeas relief, based on allegedly erroneous

justification charge, where the Appellate Division ruled that

jury instructions as a whole properly set forth New York law).

Finally, because Petitioner presents no new evidence

demonstrating his innocence, he cannot demonstrate that a

miscarriage of justice would occur if the claim is not

considered. Cf. Washington v. James, 996 F.2d 1442, 1447 (2d Cir.

1993) (finding no miscarriage of justice to overcome procedural

bar of jury instruction claim on the basis that had the jury been

properly instructed, a rational jury would still have convicted

the petitioner); Castillo v. Walsh, No. 05 Civ. 4499 (VM), 2006

_____

[2] Because trial counsel did not object to the charge, the claim
was not preserved for appellate review, thus providing further
evidence that the claim is unexhausted and procedurally barred.
See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("Under
[N.Y. Crim. Proc. Law] § 470.05(2), an objection to a ruling or
instruction of a criminal court must be raised contemporaneously
with the challenged ruling or instruction in order to preserve
the objection for appellate review.")

WL 2243044, at *5 (S.D.N.Y. Aug. 3, 2006) (holding that petitioner with procedurally barred limiting instruction claim did not show a fundamental miscarriage of justice, because the petitioner did not supply any new evidence to raise the implication of actual innocence, and the record contains ample evidence upon which the jury could have reasonably convicted him).

Thus, this Court respectfully recommends that Petitioner's jury instruction claim be dismissed as procedurally forfeited and meritless.

IV.   Grand Jury Claim

Petitioner's second claim is that his state grand jury proceedings were defective. (See Pet. at iv.)   Petitioner's argument, which was most clearly explained in his motion to vacate the judgment, is that the State failed to introduce an allegedly exculpatory videotape to the grand jury, thereby violating Petitioner's due process rights. (See Petr.'s Mot. To Vacate at 1.)[3]

---

[3] Though Petitioner frames this claim in abuse of discretion terms (see Pet. at iv), the Court construes the claim based on the alleged defect in his grand jury proceedings as a due process claim.  Because a pro se habeas filing is to be construed liberally, this Court shall address the due process argument. See Haines v. Kerner, 404 U.S. 519, 521, 92 S. Ct. 594, 596 (1972) (noting that a pro se litigant's pleadings are held to "less stringent standards than formal pleadings drafted by lawyers").

Like Petitioner's jury instruction claim, his grand jury claim is unexhausted because it was not fairly presented to the state courts. The supplemental brief filed by Petitioner's counsel with the Appellate Division made an ineffective assistance of counsel claim predicated on the advice given Petitioner by his lawyer to not testify at his grand jury proceeding. (See Petr.'s Supp. Br. at 6.) The claim now raised by Petitioner, however, is not ineffective assistance of counsel, but rather a claim targeting the State's failure to present his videotaped statement to the grand jury. Petitioner first attempted to raise the instant claim in his motion for permission to file a pro se supplemental brief (see Petr.'s Pro Se App. Mot., ¶ 6(B)), which the Appellate Division denied because Petitioner failed to "set[] forth, in detail, the specific issues sought to be raised," (Supp. Brief Order at 1). As with his jury instruction claim, Petitioner did not cure this defect in his Renewal Letter, and the Appellate Division did not review the claim. (See Second App. Denial at 3.) Because Petitioner did not use all available mechanisms to secure appellate review of this claim, it was not fairly presented, and is therefore unexhausted.

Moreover, as with the jury instruction claim, Petitioner's grand jury claim is procedurally barred because the issue cannot now be heard by the New York State courts. This claim also turns

on facts in the record, so it could only have been brought on direct appeal. See supra Discussion III, at 29-30. Petitioner is entitled to only one direct appeal, and has already brought such an appeal. See id. Accordingly, barring a showing of cause and prejudice, or a fundamental miscarriage of justice, Petitioner may not litigate this procedurally barred claim in this habeas proceeding.

Petitioner fails to make the requisite showing of cause or prejudice. He alleges no external cause for his failure to raise the claim in his initial appellate briefs, nor for his failure to elaborate on the grounds for the proposed claim, as instructed by the Appellate Division. And again, Petitioner cannot demonstrate prejudice, because his claim is not meritorious.

Under New York law, the prosecution is not required to introduce a defendant's post-arrest statement to a grand jury unless it is an exculpatory portion redacted from an introduced statement, or its exclusion would be otherwise unfair. See People v. Mitchell, 82 N.Y.2d 509, 513-14, 605 N.Y.S.2d 655, 657 (1993). As the trial court noted, the unintroduced videotaped statement was "not even substantially different from" the introduced written statement. (See Order, dated Mar. 7, 2002, attached as Ex. 3 to Respt.'s Mem., at 1.) Therefore, the prosecutor's failure to present Petitioner's videotaped statement to the grand

jury was not unfair. See Mitchell, 82 N.Y.2d at 515, 605 N.Y.S.2d at 658 ("the People maintain broad discretion in presenting their case to the Grand Jury and need not seek evidence favorable to the defendant or present all of their evidence tending to exculpate the accused"). In addition, Petitioner has failed to allege any facts that would suggest a fundamental miscarriage of justice.

In any event, where, as here, a petitioner is convicted by a jury after a trial, claims of errors in a state grand jury proceeding are generally not cognizable on federal habeas review. See Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989). A jury conviction transforms any defect connected with the grand jury's charging decision into harmless error, because the trial conviction establishes not only probable cause to indict, but also proof of guilt beyond a reasonable doubt. See United States v. Mechanik, 475 U.S. 66, 70, 106 S. Ct. 938, 942 (1986); see also United States v. Eltayib, 88 F.3d 157, 173 (2d Cir. 1996) (dismissing petitioner's grand jury-related claim "[i]n light of the Supreme Court's pronouncement that a guilty verdict by a petit jury remedies any possible defects in the grand jury indictment"); Lopez, 865 F.2d at 32 ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a jury, similar claims concerning a state grand jury

proceeding are _a_ _fortiori_ foreclosed in a collateral attack brought in a federal court"); Crawford v. Williams, No. 02 Civ. 2897 (RMB), 2003 WL 21344539, at *2 (S.D.N.Y June 10, 2003) (petitioner's claim of a defective grand jury indictment "became moot upon the petitioner's conviction at trial based upon the jury's finding him guilty beyond a reasonable doubt"). Therefore, because Petitioner was found guilty, beyond a reasonable doubt, by a petit jury after trial, any error with respect to his grand jury proceedings is rendered harmless and not subject to habeas review.

Accordingly, this Court respectfully recommends that Petitioner's claim, that his grand jury proceedings were defective, should be dismissed.

## V.    Jury Selection Claim

Petitioner next contends that the trial court improperly delegated its judicial function as supervisor of jury selection. (See Pet. at iv.)   This claim is based upon a change the trial judge made in the pre-screening questions asked of the third panel of prospective jurors, out of which the twelfth juror and three alternates were chosen.  After briefly describing the crime charged and the expected length and hours of trial, the judge asked the third panel of jurors if they "would be willing to sit on this case, and be fair in deciding whether the defendant is

guilty or not guilty." (Voir Dire Transcript, dated Sept. 27 and Oct. 2-4, 2000 ("Voir Dire Tr."), at 422.) After conferring with the attorneys, the judge dismissed, without further questioning, those who had answered negatively. (See id. at 423.) The seventeen prospective jurors who had answered affirmatively were given written questionnaires to further examine their ability to serve. (See id. at 426-41.) This approach contrasted with the procedure used to pick the first eleven jurors, in which the judge distributed written questionnaires to *all* prospective jurors, and then further questioned those whose responses indicated they might not be able to serve or be fair in their service, before allowing their dismissal. (See id. at 51-120, 234-97.) Petitioner contends that the trial judge ceded control of the process and effectively allowed the jurors to "self-select" by changing his approach with the third panel. (See Petr.'s App. Br. at 2.)

Petitioner's counsel conferred with the judge and did not object to the excusal of those prospective jurors who were unwilling to serve or be fair. (See Voir Dire Tr. at 422-23.) The First Department "decline[d] to review this unpreserved claim." Boozer, 298 A.D.2d at 261, 748 N.Y.S.2d at 379.

If a state court holding contains a plain statement that a claim is procedurally barred, then the federal habeas court may

not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10 ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). The Appellate Division decision contained a plain statement that the issue was unpreserved. New York courts regularly apply the contemporaneous objection rule, which requires that an objection to a trial court ruling be raised contemporaneously with the challenged ruling in order to preserve the objection for review. See N.Y. Crim. Proc. Law § 470.05(2); Green, 414 F.3d at 294. Thus, Petitioner's claim is procedurally barred, and this Court may not review it absent a showing by Petitioner of cause and prejudice, or a fundamental miscarriage of justice.

Petitioner alleges neither cause for, nor prejudice from, his attorney's failure to object to the challenged jury selection procedure. Petitioner never raised an ineffective assistance of trial counsel claim predicated on the failure to object to the method of jury selection. Moreover, as the Appellate Division noted, had it reviewed the claim, it would have found that the trial court's screening procedure was a proper exercise of its discretion. See Boozer, 298 A.D.2d at 261, 748 N.Y.S.2d at 380.

Indeed, New York courts have repeatedly held that a court may, sua sponte, excuse prospective jurors without voir dire by counsel when the jurors respond negatively to the court's questions regarding whether they could be fair and impartial. See People v. Vargas, 88 N.Y.2d 363, 365, 645 N.Y.S.2d 759, 760 (1996); People v. Gayle, 238 A.D.2d 133, 133-34, 655 N.Y.S.2d 513, 513 (1st Dep't 1997); People v. Mitchell, 224 A.D.2d 316, 316, 637 N.Y.S.2d 733, 733 (1st Dep't 1996). Because Petitioner has failed to demonstrate a reasonable probability that the outcome of his trial would have been different, he cannot be deemed prejudiced by the court's procedure. Additionally, Petitioner has not alleged a fundamental miscarriage of justice as a result of the excusal of unwilling prospective jurors. Finally, even if Petitioner's claim were considered on its merits, it would fail. So long as the jury that convicted Petitioner was fair and impartial, Petitioner cannot show a violation of due process. See United States v. Towne, 870 F.2d 880, 885 (2d Cir. 1989) ("Since [the defendant] has in no way established the partiality of the jury that ultimately convicted him, he may not successfully claim deprivation of his [S]ixth [A]mendment or due process rights.").

Therefore, this Court recommends that Petitioner's jury selection claim be dismissed as procedurally forfeited.

## VI.  Expert Witness Qualification Claim

Petitioner's final claim is that the trial court erred in permitting Dr. Ely to testify as an expert on blood spatter. (See Pet. at iv.)  Petitioner argues that Dr. Ely "had not taken a course of blood spatter, had never testified before as an expert on blood spatter, had rarely viewed blood spatter and had never studied or written about blood spatter." (Id.)  Petitioner concludes that the admission of her testimony deprived him of a fair trial, because it was "[t]he key evidence in this case that undermined [Petitioner's] justification defense" (Petr.'s App. Br. at 21.)

A federal court is limited on habeas review to a determination of whether an erroneous evidentiary ruling involves an error of constitutional magnitude. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102 (1990)).  "This principal applies with equal force to complaints about the improper admission of expert testimony." Swinton v. Keane, No. 89 Civ. 0933 (JSM), 1990 WL 134876, at *4 (S.D.N.Y. Sept. 13, 1990).  Therefore, a petitioner seeking habeas relief on the basis of an allegedly erroneous evidentiary ruling must establish that the trial court's error

led to the introduction of evidence "so extremely unfair that its admission violates fundamental conceptions of justice." <u>Dunnigan v. Keane</u>, 137 F.3d 117, 125 (2d Cir. 1998) (quoting <u>Dowling v. United States</u>, 493 U.S. 342, 352, 110 S. Ct. 668, 674 (1990)); <u>see also</u> <u>Zarvela v. Artuz</u>, 364 F.3d 415, 418 (2d Cir.) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a *fundamentally fair* trial.'") (quoting <u>Rosario v. Kuhlman</u>, 839 F.2d 918, 925 (2d Cir. 1988)), <u>cert. denied</u>, 543 U.S. 879, 125 S. Ct. 140 (2004).   Erroneously admitted evidence only reaches such a level of unfairness if it is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." <u>Sease v. Goord</u>, No. 01 Civ. 1378 (HB), 2003 WL 23100261, at *6 (S.D.N.Y. Dec. 30, 2003) (quoting <u>Dunnigan</u>, 137 F.3d at 125); <u>see also</u> <u>Sims v. Stinson</u>, 101 F. Supp. 2d 187, 194 (S.D.N.Y. 2000) (for an evidentiary error to reach constitutional magnitude, "it must have been 'crucial, critical, highly significant'") (quoting <u>Collins v. Scully</u>, 755 F.2d 16, 19 (2d Cir. 1985)).   In determining materiality, a federal habeas court reviews the erroneously admitted evidence "in light of the entire record before the jury." <u>Id.</u> (quoting <u>Collins</u>, 755 F.2d at 19).

43

For Petitioner to prevail under this standard, therefore, he must show that the trial court's evidentiary ruling, permitting Dr. Ely to testify as an expert on blood spatter, was both erroneous *and* deprived him of a fundamentally fair trial. Under New York State law, the admissibility and extent of expert testimony lies within the sound discretion of the trial court. People v. Lee, 96 N.Y.2d 157, 162, 726 N.Y.S.2d 361, 364 (2001). "To be qualified as an expert, the witness must possess the requisite skill, training, education, knowledge or experience from which it can be assumed that the information imparted or the opinion rendered is reliable." People v. Wemette, 285 A.D.2d 729, 730, 728 N.Y.S.2d 805, 807 (3d Dep't 2001) (citations and quotation marks omitted). However, "a physician need not be a specialist in a particular field in order to testify, provided that he possesses the requisite knowledge, and the weight to be attached to an expert's opinion is a matter for the jury." People v. Paun, 269 A.D.2d 546, 546, 703 N.Y.S.2d 256, 257 (2d Dep't 2000).

Though Dr. Ely did not specialize in blood spatter, she gave substantial testimony demonstrating her education, training, and experience in that area, and the jury was instructed that it could take her qualifications into account when evaluating her testimony. Her year of formal forensic pathology training

44

included visits to approximately fifty crime scenes, during which she was taught to "evaluate specific blood patterns and [how] that correlates to [her] medical knowledge and forensic knowledge of what it takes for people to bleed and what kinds of injury it takes for them to bleed, and what patterns that might lead to, et. cetera." (Trial Tr. at 418-20.) As a medical examiner, she continued to visit crime scenes when necessary, and gave regular lectures on the subject of blood spatter. (See id. at 401-05.) This level of familiarity was more than sufficient to qualify her as an expert on the subject. See People v. Duchowney, 166 A.D.2d 769, 770-71, 563 N.Y.S.2d 524, -- (3d Dep't 1990) (finding a police officer's basic training in the identification of counterfeit and forged instruments, and only three or four experiences in dealing with counterfeit currency, sufficient to qualify him as an expert regarding the authenticity of money possessed by the defendant).

Moreover, the jury was told that it could take Dr. Ely's qualifications into account when evaluating her testimony. The trial court instructed:

> Ordinarily a witness is not permitted to testify to an opinion. However, a witness with professed expertise in a particular science or specialized field may give an opinion in that science and field when the subject of that opinion is not within the knowledge of a person who is not trained in that particular science or field.

You may accept or reject such testimony just like the testimony [of] any other witness. In deciding whether to accept such testimony you may consider the believability of the witness, as you would any witness. You may consider the qualifications of the witness. You may consider the reasons, if any, given for the person's opinion. . . . You may consider the degree to which the opinion is consistent or inconsistent with other evidence. You may consider the accuracy or inaccuracy [of] any assumed or hypothetical facts upon which the opinion was based.

(Trial Tr. at 646-47.) Thus, the trial court properly permitted Dr. Ely to testify as an expert on blood spatter, and correctly permitted the jury to weigh her qualifications when determining what weight to give her opinions.

Even if Dr. Ely had been improperly qualified, Petitioner would still have to prove that her testimony on blood spatter deprived him of a fundamentally fair trial. This he cannot do because even without the blood spatter testimony, there was overwhelming evidence of his guilt. Norris testified, and Petitioner admitted, that he called her before the murder and specified both the motive for, and the weapon to be used in, his crime. (See Trial Tr. at 475.) Petitioner further admitted that there was blood on his own shoes, but not on Bright's feet, indicating that Bright had not walked through any of the blood. (See id. at 179, 544-45.) There were no signs of overturned furniture or broken items, and no large concentrations of blood anywhere else in the apartment. (See id. at 98.) These facts are

at odds with Petitioner's story that he and Bright struggled across the room. Petitioner further testified that Bright had woken up and put away his blanket before they fought, but crime scene photographs confirmed that Bright's body was found still laying on bedding. (See id. at 202, 478.) Additionally, Dr. Ely presented expert medical testimony that Petitioner does not challenge, and which also tends to rebut Petitioner's justification defense. In particular, Dr. Ely testified that Bright's lethal stab wound to the heart and lung was "clean," which indicated lack of movement or struggle. (See id. at 340.) Bright was also beaten with the pipe beyond the point at which he could have maintained consciousness, much less threatened Petitioner with a knife. (See id. at 434-40.) Finally, Bright's body had additional wounds, such as a stab through his eye, that Petitioner and his claim of self-defense simply could not explain. (See id. at 496-97.) Thus, in light of the entire record before the jury, Dr. Ely's additional testimony on blood spatter could not be said to have been critical to the prosecutor's case or rendered the trial fundamentally unfair. Cf. Swinton, 1990 WL 134876, at *4 (holding that the petitioner's trial was not rendered fundamentally unfair by admission of improper expert testimony, because, inter alia, the petitioner's identity as the perpetrator was established by another witness,

and circumstantial evidence placed the petitioner at the scene of the crime).

The Appellate Division found that the trial court had "properly exercised its discretion in qualifying [Dr. Ely] as an expert on blood spatter." Boozer, 298 A.D.2d at 261, 748 N.Y.S.2d at 380. The Appellate Division stated, "[a]lthough defendant contends that blood spatter is an area about which forensic pathologists are not 'ordinarily called upon to make judgments', and was therefore outside the witness's expertise, there was no such indication from [Dr. Ely's] testimony." Id. (citation omitted). It concluded that her qualification as a blood spatter expert "was fully supported by her testimony regarding her classroom and on-the-job training as well as her experience in that subject." Id. The Appellate Division's determination was not an unreasonable application of federal law.

This Court therefore recommends that Petitioner's final claim, challenging the qualification of Dr. Ely as an expert on blood spatter, be dismissed as meritless.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that this action be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that

no certificate of appealability be issued. See 28 U.S.C. §
2253(c)(2); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107,
112 (2d Cir.), cert. denied, 531 U.S. 873, 121 S. Ct. 175 (2000).
The Court further recommends that the Court certify, pursuant to
28 U.S.C. § 1915(a)(3), that any appeal from its order would not
be taken in good faith. See Coppedge v. United States, 369 U.S.
438, 82 S. Ct. 917 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the
Federal Rules of Civil Procedure, the parties shall have ten (10)
days from service of this Report to file written objections. See
also Fed. R. Civ. P. 6(a) and (e). Such objections shall be
filed with the Clerk of the Court, with extra copies delivered to
the chambers of the Honorable Richard M. Berman, United States
District Judge, and to the chambers of the undersigned, Room
1660. Any requests for an extension of time for filing
objections must be directed to Judge Berman. Failure to file
objections will result in a waiver of those objections for
purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 145, 106 S.
Ct. 466, 470 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.
1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16
(2d Cir. 1989).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:   August 17, 2006
         New York, New York


Copies sent to:

Anthony O.R. Boozer
01-A-1030
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY   12582

Yael V. Levy, Esq.
Assistant District Attorney
198 East 161st Street
New York, NY   10451